# LOAN AGREEMENT

This Loan Agreement ("Agreement") is entered into **April 20, 2017** ("Effective Date") by and among **WC 707 Cesar Chavez, LLC,** (the "Borrower"), **Natin Paul, World Class Holdings, LLC, and World Class Holdings III, LLC** (collectively "Guarantor") and **Amplify Credit Union** (the "Lender").

1. **THE LOAN.** Lender agrees to lend and Borrower agrees to borrow an amount not to exceed the sum of **Two Million Seven Hundred Thirteen Thousand Two Hundred Fifty-Two and No/100 Dollars ($2,713,252.00)** (the "Loan") on the terms and conditions set forth herein. The Loan will be evidenced by Borrower's Note of even date herewith, or any renewal thereof with interest and principal payable as stated therein (the "Note").

2. **SECURITY.** The Loan shall be secured by:

**Deed of Trust (with security agreement and assignment of rights and leases) ("Deed of Trust") an Assignment of Leases and Rents along with related UCC financing statements, upon and against each of the parcels of real property more specifically described on Attachment A attached hereto (each a "Property" or collectively, the "Properties"), and insured by a mortgagee title policy of insurance (the "Title Policy") in the form promulgated by the Texas Board of Insurance dated the date of the filing of such Deed of Trust issued by (the "Title Company") in an amount satisfactory to Lender by the terms of which Title Company commits to insure that the Deed of Trust constitutes a valid and prior first lien covering the Property, subject only to those exceptions and encumbrances as may be acceptable to Lender; and**

The Deed of Trust, the Assignment of Leases and Rents, the Guaranties, and this Loan Agreement and all other documents referenced herein may be referred to as the "Security Documents". The Properties may be sometimes referred to as the "Collateral". When Collateral is pledged as security for the Loan, Borrower will grant to Lender a first lien in the Collateral (unless otherwise represented) and agrees to do all things necessary to perfect the lien of Lender in such Collateral.

3. **GUARANTIES**. If any Guarantors are executing this Loan Agreement, the Loan will be unconditionally guaranteed as evidenced by guaranties executed by each of the Guarantors of even date herewith (collectively "Guaranty").

4. **CONDITIONS PRECEDENT.** The obligation of Lender to make the Loan to Borrower is subject to the conditions precedent that, as of the date of any advance of the Loan, and after giving effect thereto:

(a) Lender shall have received the duly executed Note, Agreement and Security Documents;

(b) Lender shall have received the Title Policy, along with such surveys, appraisals, environmental site audits or assessments, evidence of insurance and evidence of payment of taxes, all associated with the Property, in form and substance satisfactory to Lender, that Lender may require;

(c) Lender shall have received from each Guarantor a duly executed Guaranty, if applicable;

(d) Lender shall have received evidence, in form and substance satisfactory to Lender, of property and casualty insurance, covering the business assets of the Borrower, including the Collateral, of a nature and in an amount satisfactory to Lender;

(e) Lender shall have received copies, in form and substance satisfactory to Lender, of the organizational documents of Borrower and any related entities obligated under the Note or Security Documents, including but not limited to its limited partnership agreement, articles of incorporation, bylaws, organizational consents, authorizing resolutions and any certificates of ownership, if any.

(f) all representations and warranties made to Lender in this Agreement and the Security Documents shall be true and correct, as of and if made on such date;

(g) no material adverse change in the financial condition of Borrower since the effective date of the most recent financial statements furnished to Lender by Borrower shall have occurred and be continuing;

(h) no event has occurred and is continuing, or would result from the requested advance, which with notice or lapse of time, or both, would constitute an Event of Default (as hereafter defined); and

(i) Lender shall not be obligated to make advances under the Note until it shall have (i) received and reviewed to its satisfaction an updated appraisal report on the Properties, and (ii) determined that, in connection with any request for an advance, that the aggregate amount to be advanced under the Loan will not exceed 75% of the appraised value contained in such appraisal report.

(j) Full payment of the Loan Origination Fee payable to the Lender in connection with the Loan, which shall be deemed fully earned by the Lender upon execution of this Loan Agreement regardless of the amount of proceeds of the Loan disbursed hereunder.

5. **REPRESENTATIONS AND WARRANTIES.** In order to induce the Lender to make the Loan hereunder, each Borrower and each Guarantor, if applicable, jointly and severally represents and warrants to Lender that:

(a) Borrower is a Delaware limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and qualified to do business in Texas, and has the power to own its assets and to transact the business in which it is presently engaged. There are no jurisdictions other than the State of Texas in which the character of the properties owned or proposed to be owned by the Borrower or in which the transaction of its business as now conducted or as proposed to be conducted requires or will require the Borrower to qualify to do business in any such jurisdiction;

(b) Borrower and Guarantor, as appropriate, has full power and authority to execute, deliver and perform this Agreement, the Note, the Guaranty, if applicable, and the Security Documents to be executed by it, and to borrow hereunder and has taken all necessary action to authorize (i) the borrowing hereunder on the terms and conditions of this Agreement and (ii) the execution, delivery and performance of this Agreement, the Note, the Security Documents to be executed by it and all other agreements, instruments and documents provided for herein or therein;

(c) this Agreement, the Note, the Guaranty, if applicable, and the Security Documents are the legal and binding obligations of Borrower or Guarantor, as appropriate, enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights;

(d) neither the execution or delivery of this Agreement, the Note, the Guaranty, if applicable, or the Security Documents, nor consummation of any of the transactions herein, or therein contemplated,

nor compliance with the terms and provisions hereof or thereof, will contravene or conflict with any provision of law, statute or regulation to which Borrower or Guarantor, as appropriate, is subject or any judgment, license, order or permit applicable to Borrower or Guarantor, as appropriate, or any indenture, mortgage, deed of trust or other instrument to which Borrower or Guarantor, as appropriate, may be subject; no consent, approval, authorization or order of any court, governmental authority or third party is required in connection with the execution and delivery by Borrower or Guarantor, as appropriate, of this Agreement or any of the other Security Documents or to consummate the transactions contemplated herein or therein;

(e) all financial statements, if any (which financial statements do not include pro forma projections of Borrower) delivered by Borrower and Guarantor, if applicable, to Lender prior to the date hereof are true and correct, fairly present the financial condition of Borrower and Guarantor, as appropriate, and have been prepared in accordance with generally accepted accounting principles, consistently applied; as of the date hereof, there are no obligations, liabilities or indebtedness (including contingent and indirect liabilities) which are material to Borrower or Guarantor and not reflected in such financial statements; and no material adverse changes have occurred in the financial condition or business of Borrower or Guarantor since the date of the most recent financial statements which Borrower and Guarantor, if applicable, has delivered to Lender;

(f) except as otherwise disclosed to Lender in writing on or prior to the date hereof, no litigation, investigation, or governmental proceeding is pending, or, to the knowledge of Borrower or any applicable Guarantor, threatened against or affecting Borrower or such Guarantor, which may result in any material adverse change in the business, properties or operations of Borrower or any applicable Guarantor;

(g) there is no fact known to Borrower or Guarantor, if applicable, that Borrower or Guarantor have not disclosed to Lender in writing which may result in any material adverse change in the business, properties or operations of Borrower or Guarantor;

(h) Borrower owns all of the Collateral and the assets reflected on its most recent balance sheet free and clear of all liens, security interests or other encumbrances, except those to Lender created pursuant to this Agreement or as previously disclosed in writing to Lender;

(i) the principal office and principal place of business of Borrower is **401 Congress Avenue, 33rd Floor, Austin, Texas 78701;**

(j) all taxes required to be paid by Borrower and Guarantor, if applicable, have in fact been paid, except for taxes being contested in good faith by appropriate proceedings for which adequate reserves have been established;

(k) Borrower and Guarantor, if applicable, is not in violation of any law, ordinance, governmental rule or regulation to which it is subject, and is not in default under any material agreement, contract or understanding to which it is a party;

(l) no certificate or statement herewith or heretofore delivered by Borrower or any applicable Guarantor to Lender in connection herewith, or in connection with any transaction contemplated hereby, contains any untrue statement of a material fact or fails to state any material fact necessary to keep the statements contained therein from being misleading;

(m) since the last financial statements submitted to the Lender, there has not been any material adverse change in the Collateral or in the condition (financial or otherwise), assets, liabilities,

operations or business of Borrower from that shown on the financial information, projections and other information presented to the Lender; and

(n) the consummation of the transactions contemplated in the Agreement and Security Documents will not result in the breach of or constitute a default under the organizational documents of the Borrower or any agreement or court decree to which Borrower is a party or by which Borrower or its assets or properties are bound.

6. **AFFIRMATIVE COVENANTS.** In order to induce the Lender to make the Loan hereunder, until payment in full of the Note and full and complete performance of all other obligations of Borrower hereunder, and under the Security Documents, Borrower and Guarantor, if applicable, will (unless Lender shall otherwise consent in writing):

(a) maintain its ability to do business in the State of Texas and conduct its business in an orderly and efficient manner consistent with good business practices and in accordance with all valid regulations, laws and orders of any governmental authority, maintaining all licenses, privileges, certificates and the like necessary for the operation of its business, and will act in accordance with customary industry standards in maintaining and operating its assets, properties and investments;

(b) maintain complete and accurate books and records of its transactions in accordance with generally accepted accounting principles, and will give Lender access during business hours upon reasonable advance notice and as often as Lender may desire to all books, records and documents of Borrower and permit Lender to make and take away copies thereof, and will pay the reasonable fees and disbursements of any accountants or other agents of Lender selected by Lender for the foregoing purposes;

(c) promptly notify Lender in writing, immediately upon becoming aware of (i) any material adverse change in its financial condition or business; (ii) any default under any material agreement, contract or other instrument to which Borrower or any applicable Guarantor is a party or by which any of its properties are bound, or any acceleration of any maturity of any indebtedness owing by Borrower or any applicable Guarantor, (iii) any material adverse claim against or affecting Borrower or any applicable Guarantor or any of its properties; and (iv) any litigation, or any claim or controversy which might become the subject of litigation, against Borrower or any applicable Guarantor or affecting any property of Borrower or such Guarantor, if such litigation or potential litigation might, in the event of an unfavorable outcome, have a material adverse effect on the financial condition or business of Borrower or applicable Guarantor or might cause an Event of Default (hereafter defined), such written notice specifying the nature and period of existence thereof and any action which Borrower or any applicable Guarantor are taking or propose to take with respect thereto;

(d) provide Lender with any new leases and renewals applicable to the Properties as obtained, and provide annually, as soon as available, but in any event by 120 days after Borrower's fiscal year end, furnish to Lender financial statements of Borrower containing a balance sheet of Borrower as of the last day of such fiscal year and statements of income, cash flow and contingent liabilities, all in reasonable detail and form acceptable to Lender;

(e) annually, within 30 days of filing with the Internal Revenue Service, but in any event no later than the end of October of each calendar year, furnish to Lender copies of each Borrower's federal income tax returns;

 (f) annually, within 30 days of the one-year anniversary date of the last personal financial statement in file, furnish to Lender an updated personal financial statement which includes assets, liabilities, contingent liabilities, and personal cash flow information of each applicable Guarantor;

 (g) annually, within 30 days of filing with the Internal Revenue Service, but in any event no later than the end of October of each calendar year, furnish to Lender copies of each applicable Guarantor's federal income tax returns;

 (h) promptly furnish to Lender, at Lender's request, such additional financial or other information concerning assets, liabilities, business operations, financial condition and transactions of Borrower or each applicable Guarantor as Lender may from time to time reasonably request (it being understood and agreed that Borrower shall not be required to furnish audited financial statement, and that all financial statements to be furnished in accordance with this Section 6 shall consist of compilation statements);

 (i) upon thirty days written request of Lender, reimburse Lender for the full cost of narrative appraisals and environmental assessments of the Property, each such appraisal and assessment to be ordered directly by Lender from an appraiser or inspector, as appropriate, satisfactory to Lender in its sole discretion and in form and substance necessary to comply with all laws and regulations affecting Borrower, a copy of each such appraisal and assessment to be provided to Borrower not later than the date on which Lender's reimbursement is received by Lender (failure of Borrower to reimburse lender for any requested appraisal or assessment, will constitute an event of default under this Agreement);

 (j) promptly pay all taxes for which the respective party is responsible as they become due and payable, and promptly pay all lawful claims, whether for labor, materials or otherwise, which might or could, if unpaid, become a lien or charge on any property or assets of Borrower, unless and to the extent only that the same are being contested in good faith by appropriate proceedings and reserves deemed adequate by Lender have been established therefore;

 (k) annually, as soon as available, but in any event within 30 days of taxes becoming due and payable, furnish to Lender proof of paid taxes receipts;

 (l) annually not later than 120 days after, and as of the end of each calendar year provide Lender schedules of real estate and all leases and rent rolls applicable to all properties owned by Borrower and other documentation as to the lease and occupancy of the Properties as requested by Lender in form and substance acceptable to Lender;

 (m) if at any time while this Agreement remains in effect improvements are made to the Property, maintain on its properties insurance of responsible and reputable companies in such amounts and covering such risks as is acceptable to Lender, is prudent and is usually carried by companies engaged in business similar to that of Borrower; Borrower shall furnish Lender, on request, with certified copies of insurance policies or other appropriate evidence of compliance with the foregoing covenant;

 (n) if at any time while this Agreement remains in effect improvements are made to the Property, annually, as soon as possible, but in any event within 30 days of any insurance premium becoming due and payable, furnish to Lender proof of insurance; should Borrower receive any notice of cancellation or notification of its insurance policy in any form, Borrower shall furnish Lender a copy of such notice within three (3) days of receipt;

 (o) Intentionally Deleted.

(p) allow Lender access to Borrower's premises, books and records as Lender deems necessary during Borrower's normal business hours to conduct routine field examinations with respect to Borrower, its operations and the Collateral; and

(q) maintain the following financial covenants at loan approval, if any financial covenant fitness was achieved through a global analysis of Borrower and the Guarantors, as applicable, then the same standard will be applied throughout the term of the Loan:

(1) The Minimum Debt Service Coverage Ratio ("DSCR") shall be tested annually beginning December 31, of the year in which the Note is dated, and continuing regularly and annually thereafter, and shall be maintained at a ratio of not less than 1.20:1. DSCR shall be defined as follows: (Net Operating Income + Depreciation + Interest Expense + Lease Payments) / (Current Maturities of Long Term Debt + Interest Expense + Lease Payments).

(2) The Minimum Debt to Equity Ratio ("DE") shall be tested annually beginning December 31, of the year in which the Note is dated, and continuing regularly and annually thereafter, and shall be maintained at a ratio of not less than the ratio in effect at loan approval (i.e. 47%). DE shall be defined as follows: (Total Debt)/(Shareholder Equity + Additional in Capital + Retained Earnings).

7. **NEGATIVE COVENANTS.** So long as Borrower may borrow hereunder and until payment in full of the Note and performance of all other obligations of Borrower hereunder, Borrower and Guarantor will not, as applicable, without the prior written consent of Lender:

(a) allow Borrower to pay any amounts by way of salary, bonus, dividends, distributions or otherwise, to any shareholders, partners or applicable Guarantors in any calendar year; without prior written consent of Lender which would cause Borrower to be in default of any loan agreement covenants; provided however, that it is expressly understood that the following payments shall not constitute a default: management fees and salaries;

(b) allow Borrower to liquidate, dissolve or reorganize; or merge or consolidate with, or acquire all or substantially all of the assets of, any other company, firm or association; or make any other substantial change in its capitalization or its business, which would cause Borrower to be in default of any loan agreement covenants; provided however, that if Borrower otherwise complies with the Loan Agreement covenants, Borrower shall not be restricted in the management, collateralization, sale or purchase of other properties which it owns or intends to own after the Effective Date;

(c) allow Borrower to purchase, redeem or repurchase any equity interest in Borrower, which would cause Borrower to be in default of any loan agreement covenants;

(d) allow Borrower to sell any of its assets used or useful in its business, except in the ordinary course of business; or sell any of its assets to any other person, firm or corporation with the agreement that such assets shall be leased back to Borrower or an applicable Guarantor, which would cause Borrower to be in default of any loan agreement covenants;

(e) knowingly grant, suffer or permit liens on or security interests in Borrower's assets or the Collateral or fail to promptly pay all lawful claims, whether for labor, materials or otherwise, which would cause Borrower to be in default of any loan agreement covenants; notwithstanding the above, in the event mechanic's lien affidavits or claims are filed against the Property or Improvements, Borrower agrees to cause said claims or liens to be released or to bond around said claims or liens within ten (10) days written notification to or from Lender and to provide Lender with copies of said releases or bonds.

(f) allow Borrower to make any loans, advances or investments to or in any joint venture, corporation or other entity, except for the purchase of obligations of Lender or U.S. Government obligations, which would cause Borrower to be in default of loan agreement covenants;

(g) allow Borrower to create, incur, assume or become liable in any manner for any indebtedness (for borrowed money, deferred payment for the purchase of assets, lease payments, as surety or guarantor for the debt of another, or otherwise, except for (i) trade accounts payable incurred in the ordinary course of Borrower's business which, at any time during the term of this Agreement, does not exceed $10,000 per month and (ii) acquisition of equipment which, in the aggregate during the term of this Agreement, does not exceed $25,000 other than to Lender;

(h) allow Borrower to substantially change its present executive or management personnel;

(i) allow Borrower to change the general character of business as conducted at the date hereof, or engage in any type of business not reasonably related to its business as presently and normally conducted;

(j) allow Borrower to violate or fail to comply with any covenants or agreements regarding other debt which will or would with the passage of time or upon demand cause the maturity of any other debt to be accelerated;

(k) allow Borrower to enter into any transaction, including, without limitation, the purchase, sale or exchange of property or the rendering of any service, with any Affiliate (as hereafter defined) of Borrower, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms no less favorable to Borrower than would be obtained in a comparable arm's length transaction with a person or entity not an Affiliate of Borrower, which would cause Borrower to be in default of any loan agreement covenants; or

(l) make any payments of principal or interest on any of the subordinated notes without prior written consent of Lender during any period Borrower is in default under the Note, Security Documents or this Agreement.

8. **OTHER AGREEMENTS.**

(a) Expenses. During the term of this Agreement and for as long as any amounts remain outstanding under the Loan, Borrower agrees to pay directly, or to promptly reimburse Lender for its payment of all expenses incurred by Lender in connection with the Loan, including without limitation all costs, fees and expenses of counsel paid or incurred by Lender incident to this Agreement, the Note, the Guaranties, if applicable, and the Security Documents or incident to the collection of the Loan hereunder, appraisal fees, lien search charges, and the cost of any audits, including environmental audits and assessments. All obligations of the Borrower under this section shall survive the termination or cancellation of this Loan Agreement for any reason whatsoever.

(b) <u>Commissions or Fees to Third Parties.</u> Borrower, Lender and each applicable Guarantor each represent and warrant to the other that no brokerage commission, placement fee or finder's fee is payable to any person or entity in connection with the transactions contemplated hereby. Each party does hereby agree to indemnify, defend and hold the other harmless from and against the payment of any commission or fee to any person or entity claiming by, through or under Borrower, Lender or any Guarantor, as applicable, with respect to the services claimed to have been rendered in connection with the execution of this Agreement or the transactions set forth herein, and, notwithstanding anything herein to the contrary, this indemnity shall survive the Closing or termination of this Agreement.

(c) <u>Maintenance of Loan to Value.</u> In the event that, as a result of any written appraisal, ordered by Lender, the Lender determines that the then outstanding balance of the Note is more than eighty percent (80%) of the appraised value of the Real Property, within thirty (30) days following written demand by Lender, Borrower will provide Lender, at Lender's option, with additional collateral or pay down the balance of the Note as necessary to reduce the percentage to eighty percent (80%) or lower as reasonably acceptable to Lender.

9. **EVENTS OF DEFAULT.** An "Event of Default" shall exist if any one or more of the following events (herein collectively called "Events of Default") shall occur:

(a) Borrower or any Guarantor, as appropriate, shall fail to pay when due any principal of, or interest on, the Note or any other fee or payment due hereunder or under any of the Guaranties, if applicable or Security Documents, and such default shall have occurred and remain uncured for a period of ten (10) days following the receipt of written notice by Borrower and each applicable Guarantor of the existence of such default;

(b) any representation or warranty made in this Agreement, the Note, or in any of the Guaranties, if applicable, or Security Documents shall prove to be untrue or inaccurate in any material respect as of the date on which such representation or warranty is made;

(c) Borrower becomes insolvent or there is a material adverse change in the assets, liabilities or financial condition of Borrower or any Guarantor, including but not limited to a decline in the personal credit score of Borrower or any Guarantor during the term of the loan of 40 points or more;

(d) any action or proceeding is commenced by any partner, principal or member in Borrower which seeks as one of its remedies the dissolution of Borrower or any partner, principal or member (as applicable) in Borrower which is not discharged within ten (10) days;

(e) default shall occur in the performance of any of the covenants or agreements of Borrower or applicable Guarantor contained herein or in the Note, the Guaranties, if applicable, or in any of the Security Documents, and such default shall have occurred and remain uncured for a period of thirty (30) days following the receipt of written notice by Borrower and each applicable Guarantor of the existence of such default;

(f) Borrower or Guarantor, if applicable, shall (i) apply for or consent to the appointment of a receiver, custodian, trustee, intervenor or liquidator of itself or of all or a substantial part of its assets, (ii) voluntarily become the subject of a bankruptcy, reorganization or insolvency proceeding or be insolvent or admit in writing that it is unable to pay its debts as they become due, (iii) make a general assignment for the benefit of creditors (iv) file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws, (v) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding, (vi) become the subject of an order for relief

under any bankruptcy, reorganization or insolvency proceeding, or (vii) fail to pay any money judgment against it before the expiration of thirty days after such judgment becomes final and no longer subject to appeal;

(g) an order, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition appointing a receiver, custodian, trustee, intervenor or liquidator of Borrower or applicable Guarantor or of all or substantially all of its or his assets, and such order, judgment or decree shall continue unstayed and in effect for a period of 30 days; or a complaint or petition shall be filed against Borrower or applicable Guarantor seeking or instituting a bankruptcy, insolvency, reorganization, rehabilitation or receivership proceeding of Borrower or applicable Guarantor, and such petition or complaint shall not have been dismissed within thirty days;

(h) any Borrower shall sell, transfer or otherwise convey their interest in the Collateral without prior written consent of the Lender other than incidental sales of personal property in the ordinary course of business; or

(i) A Borrower or Guarantor, if applicable, shall be adjudicated as Bankrupt.

10. **REMEDIES UPON EVENT OF DEFAULT.** If an Event of Default shall have occurred, Lender at its option may (a) declare the principal of, and all interest then accrued on, the Note and any other liabilities of Borrower to Lender to be forthwith due and payable, whereupon the same shall forthwith become due and payable without notice, presentment, demand, protest, notice of intention to accelerate, or other notice of any kind, all of which Borrower hereby expressly waives, anything contained herein or in the Note to the contrary notwithstanding (b) reduce any claim to judgment, and/or (c) without notice of default or demand, pursue and enforce any of Lender's rights and remedies under this Agreement, the Note, the Guaranties, if applicable, the Security Documents or otherwise provided under or pursuant to any applicable law or agreement. **Borrower agrees that, in addition to Lender's other rights and remedies (unless waived in writing by Lender from time to time in its sole discretion), the interest rate on the Secured Note will increase by one quarter of a percent (.25%) (i) if any documentation set forth in Section 6 above is not furnished to Lender within thirty (30) days of the due date set forth above, and (ii) Borrower fails to provide such documentation within ten (10) days of written notice from Lender. The interest rate on the Secured Note will increase by an additional one quarter of a percent (.25%) if the documentation set forth in Section 6 above continues to not be furnished by Borrower within sixty (60) days of the due date set forth above. If Borrower is not otherwise then in default of the Secured Note, Lender will abate the increases on the Secured Note provided for in this paragraph within thirty (30) days of receipt of all documentation required herein.**

11. **MISCELLANEOUS.**

(a) Notices. Any notices or other communications required or permitted to be given hereunder or under the Note, the Guaranties, if applicable, or the Security Documents must be given in writing and must be personally delivered or mailed by prepaid certified or registered mail to the party to whom such notice or communication is directed at the address of such party as follows:

(i) Borrower: **WC 707 Cesar Chavez, LLC**
**401 Congress Avenue, 33rd Floor**
**Austin, Texas 78701**

(ii) Lender: **Amplify Credit Union**

               Business Lending Department
               3600 W. Parmer Lane
               Austin, Texas 78727

  (iii)  Guarantor:     Natin Paul
               7800 Cava Place
               Austin, Texas 78735

               World Class Holdings, LLC
               401 Congress Avenue, 33rd Floor
               Austin, Texas 78701

               World Class Holdings III, LLC
               401 Congress Avenue, 33rd Floor
               Austin, Texas 78701

  Any such notice or other communication shall be deemed to have been given (whether actually received or not) on the day it is personally delivered as aforesaid or, if mailed, on the third day after it is mailed as aforesaid. Any party may change its address for purposes of this Agreement by giving notice of such change to all other parties pursuant to this Section 11(a).

  (b) <u>Governing Law.</u> This Agreement, the Note, the Guaranties, if applicable, and the Security Documents are being executed and delivered, and are intended to be performed, in the State of Texas, and the substantive laws of Texas shall govern the validity, construction, enforcement and interpretation of this Agreement, the Note, the Guaranties, if applicable, and the Security Documents, except to the extent: (i) otherwise specified therein; (ii) the federal laws governing national banks expressly supersede and have contrary application; or (iii) federal laws governing maximum interest rates shall provide for rates of interest higher than those permitted under the laws of the State of Texas.

  (c) <u>Invalid Provisions.</u> If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

  (d) <u>Maximum Interest Rate.</u> Regardless of any provisions contained in this Agreement, the Note, the Guaranties, if applicable, or in any of the Security Documents, Lender shall never be deemed to have contracted for or be entitled to receive, collect or apply as interest on the Note, any amount in excess of the maximum rate of interest permitted to be charged by applicable law, and, in the event Lender ever receives, collects or applies as interest any such excess, such amount which would be excessive interest shall be deemed to be a partial prepayment of principal and treated hereunder as such, and, if the principal balance of the Note is paid in full, any remaining excess shall forthwith be paid to Borrower. In determining whether or not the interest paid or payable under any specific contingency exceeds the highest lawful rate, Borrower, and Lender shall, to the maximum extent permitted under applicable law, (i) characterize any non-principal payment (other than payments which are expressly designated as interest payments hereunder) as an expense, fee, or premium, rather than as interest, (ii) exclude voluntary prepayments and the effect thereof, and (iii) spread the total amount of interest throughout the entire contemplated term of the Note so that the interest rate is uniform throughout such term.

(e) <u>Entirety and Amendments.</u> This Agreement, including any addenda thereto, together with the Note, the Guaranties, if applicable, and the Security Documents embody the entire agreement between the parties and supersede all prior agreements and understanding, if any, relating to the subject matter hereof and thereof, and this Agreement, the Note, the Guaranties, if applicable, and the Security Documents may be amended only by an instrument in writing executed by the party, or an authorized officer of the party against whom such amendment is sought to be enforced.

(f) <u>Parties Bound.</u> This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Borrower may not, without the prior written consent of the Lender, assign any rights, powers, duties or obligations hereunder.

(g) <u>Headings.</u> Section headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement.

(h) <u>Financial Terms.</u> As used in this Agreement, all financial and accounting terms not otherwise defined herein shall be defined and calculated in accordance with generally accepted accounting principles consistently applied.

(i) <u>Cumulative Rights and No Waiver.</u> Each and every right granted to Lender hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law or equity shall be cumulative of and may be exercised in addition to any and all other rights of Lender, and no delay in exercising any right shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right preclude any other or future exercise thereof or the exercise of any other right. Any of the foregoing covenants and agreements may be waived by Lender but only in writing signed by a Vice President or higher level officer of Lender. Borrower expressly waives any presentment, demand, protest or other notice of any kind.

No notice to or demand on Borrower in any case shall, of itself, entitle Borrower to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising any power or right hereunder shall impair any such right or power or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder.

(j) <u>Participation of the Loan.</u> Borrower agrees that Lender may, at its option, sell interests in the Loan and its rights under this Agreement and the Security Documents to a financial institution or institutions and, in connection with each such sale, Lender may disclose any financial and other information available to Lender concerning Borrower to each prospective purchaser.

(k) <u>Expenses.</u> Borrower shall pay all costs and expenses (including, without limitation, reasonable attorney's fees) in connection with (i) any action required in the course of administration of the indebtedness and obligations evidenced by the Security Documents, and (ii) any action in the enforcement of Lender's rights upon the occurrence of an Event of Default.

(l) <u>Conflicts.</u> In the event any term of provision hereof is inconsistent with or conflicts with any provision of the other Security Documents, the terms and provisions contained in this Agreement shall be controlling.

(m) <u>Counterparts.</u> This Agreement may be separately executed in any number of counterparts, each of which shall be an original, but all of which, taken together, shall be deemed to constitute one and the same instrument.

(n) <u>Waiver of Trial by Jury.</u> **EACH PARTY BY THEIR ACCEPTANCE HEREOF, HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THE DEED OF TRUST, THIS LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF THE PARTIES, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. ANY PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE PARTIES, AS THE CASE MAY BE.**

(o) <u>No Oral Commitments.</u> **THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWER:**

**WC 707 Cesar Chavez, LLC,**
   **a Delaware limited liability company**

By: _____/s/ Natin Paul_____
   Name: Natin Paul
   Title: President

**GUARANTORS:**

_____/s/ Natin Paul_____
Natin Paul

**World Class Holdings, LLC**

By: _____/s/ Natin Paul_____
   Name: Natin Paul
   Title: President

**World Class Holdings III, LLC**

By: _____
Name: Natin Paul
Title: President


**LENDER:**

**Amplify Credit Union**

By: _____
Shirley Sheffield
Loan Officer

## ATTACHMENT "A"

### LEGAL DESCRIPTION

Lots 7, 8, 9 and 10, Block 190, ORIGINAL CITY OF AUSTIN, a subdivision in Travis County, Texas, according to the Plat on file at the General Land Office of the State of Texas, being more particularly described as follows:

Beginning at an iron rod found at the south side of East Cesar Chavez Street (80' wide), the same being the west side of Interstate Highway 35, thence along Interstate Highway 35, South $18°54'00"$: West 153.83' to an iron rod found; thence along Driskill Street, North $71°05'43"$ West, 171.91' to an iron rod found; thence along the same, North $71°06'10"$ West, 43.36' to an iron rod found; thence along lands of James J. Pecora, Sr., Trustee, North $18°50'16"$ East, 154.17' to an iron rod found; thence along East Cesar Chavez Street, South $70°54'35"$ East, 43.40' to a PK nail found; thence South $71°01'46"$ East, 172.03' to the point and place of beginning.
Containing 0.76 of an acre of land, more or less.